IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| TAMIKA CRAIGE and JEREMIAH THOMAS,<br><br>Plaintiffs,<br><br>v.<br><br>GOVERNMENT EMPLOYEES INSURANCE COMPANY and NATIOWNIDE AFFINITY INSURANCE COMPANY OF AMERICA,<br><br>Defendants. | ) | 1:19-cv-408 |

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, Chief District Judge.

Before the court are cross-motions for summary judgment filed by Plaintiffs Tamika Craige and Jeremiah Thomas (Doc. 31) and Defendants Government Employees Insurance Company ("GEICO") (Doc. 42) and Nationwide Affinity Insurance Company of America ("Nationwide") (Doc. 44). Also before the court is Plaintiffs' motion to stay discovery pending ruling on Plaintiffs' motion for summary judgment. (Doc. 33.) The motions have been fully briefed, and the court heard argument on them on November 19, 2020. For the reasons set forth below, the court will deny Defendants' motions for summary judgment and grant Plaintiffs' motion for summary judgment. Plaintiffs' motion to stay discovery will be denied as moot.

## I. BACKGROUND

The facts, either not in dispute or viewed in the light most favorable to the non-moving parties in the cross-motions for summary judgment, establish the following:[1]

On September 21, 2013, James Rigsbee ("Rigsbee"), age 45, was operating a vehicle in Durham, North Carolina, when he was stopped and issued a citation for having an expired registration and driving with his license revoked. (Doc. 23-3 at 1; Doc. 32-3 at 12.) The citation listed Rigsbee's address as 108 East Edgewood Drive, Durham, North Carolina. (Id.)

Later that day, Rigsbee was involved in a vehicular accident with Craige and Thomas, as well as others. (Doc. 32 at 2–3; Doc. 37 at 4; Doc. 38 at 2.) The vehicle Rigsbee drove at the time of the accident, a commercial vehicle owned by Shelby Wilson, was insured by Peak Property and Casualty Insurance Corporation ("Peak"). (Doc. 37 at 5; Doc. 38 at 2; Doc. 40 at 4.) The accident report listed Rigsbee's address as 2734 Weldon Terrace, Durham, NC. (Doc. 32-5 at 14.) As a result of the collision, Plaintiffs suffered bodily and mental injuries. (Doc. 14-3.)

At the time of the accident, Rigsbee's brother, Matthew

[1] GEICO argues that Plaintiffs' response to GEICO's request for admission of fact was untimely and should therefore be deemed admitted. (Doc. 43 at 7.) This appears to be of no matter, as the facts as alleged in GEICO's request for admission do not differ in any significant manner from the facts as described here. (See Doc. 37-3.) Any difference is based on record evidence that is not controverted.

Rigsbee ("M. Rigsbee"), was the named insured on Nationwide Auto Policy 6132C 642258 ("the Nationwide policy"). (Doc. 32 at 2; Doc. 38 at 2.) Rigsbee's mother, Mary Overby ("M. Overby") and stepfather, Asa Overby ("A. Overby"), were the named insureds on GEICO Auto Policy 4259-30-93-85 ("the GEICO policy"). (Doc. 32 at 2; Doc. 37 at 2.) Under both the Nationwide and GEICO policies, M. Rigsbee, M. Overby, and A. Overby (collectively "the named insureds") were listed as residing at 108 East Edgewood Drive in Durham, NC. (Doc. 32 at 2; Doc. 37 at 2; Doc. 38 at 2.)

As a result of the accident, Rigsbee was charged with multiple offenses, including driving left of center, driving while license revoked, expired registration, and driving while subject to an impairing substance. (Doc. 14-3 ¶ 9.) On October 29, 2013, Rigsbee completed an affidavit of indigency and listed his address as 108 East Edgewood Drive, Durham, North Carolina. (Doc. 23-3 at 3.) On November 22, 2013, Rigsbee was issued an identification card from the North Carolina Division of Motor Vehicles that listed his address as 108 East Edgewood Drive, Durham, North Carolina. (Doc. 32-3 at 3.)

As early as December 2, 2014, Plaintiffs' counsel informed Nationwide that they were seeking coverage under the Nationwide policy for the injuries stemming from Rigsbee's accident. (Doc. 38-7 ¶ 4.) Sometime before March 2, 2015, Plaintiffs' counsel also contacted GEICO and informed it of the claim against Rigsbee.

(Doc. 32-2; see also Doc. 32-3.) After that time, Defendants each undertook independent investigations of the claim and determined Rigsbee was not a covered insured under their respective policies. (See Docs. 37-2, 38-7.)

On June 2, 2016, Plaintiffs filed a complaint in North Carolina state court against Rigsbee, Wilson, and Wilson's company, Tasty Haven, LLC, seeking damages arising out of the accident. (Doc. 32-5.) On November 14, 2016, Peak filed a motion to intervene in the lawsuit "to defend th[e] action in the name of its insured, Defendant James Arthur Rigsbee." (Doc. 38-2.) On March 31, 2017, Nationwide and GEICO were served with copies of the underlying complaint and summonses. (Doc. 32-10.) Both Nationwide and GEICO denied coverage and did not defend Rigsbee in the underlying suit. (Doc. 32 at 4; Doc. 37 at 7; Doc. 38 at 6.) A trial was held in Durham County Superior Court during the week of June 11, 2018. (Doc. 14-3.) That same week, the court granted Peak's motion to be relieved from Rigsbee's defense based on Peak having paid its per-accident limit to the relevant claimants, thus fulfilling its obligation to Rigsbee. (Docs. 40-2, 40-3.) As such, Peak did not defend Rigsbee in the trial and ultimately Rigsbee did not appear at the trial. (Doc. 14-3.) On June 13, 2018, after trial, the court found in favor of Plaintiffs and awarded Craige $206,750 and Thomas $61,500 in compensatory and punitive damages against Rigsbee. (Id. at 4.)

On March 14, 2019, Plaintiffs filed the present declaratory judgment action in North Carolina state court. (Doc. 1-1.) On April 16, 2019, Defendants removed the matter to this court. (Doc. 1.) On March 26, 2020, Plaintiffs moved for summary judgment (Doc. 31) and to stay discovery pending ruling on that motion (Doc. 33). Defendants timely responded in opposition (Docs. 37, 38), and Plaintiffs filed replies (Docs. 40, 41). On May 20 and 21, 2020, GEICO and Nationwide moved for summary judgment, respectively. (Docs. 42, 44.) Those motions are fully briefed. (Docs. 47, 48, 49, 50.) All motions are ready for resolution.

## II. ANALYSIS

### A. Standard of Review

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). In a diversity case, a district court will apply the conflict of laws rules of the forum state. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941). North Carolina statutory law specifies that any policy insuring interests in North Carolina "shall be deemed" to have been made in and subject to the laws of North Carolina. N.C. Gen. Stat. § 58-3-1; see also Fortune Ins. Co. v. Owens, 512 S.E.2d 487, 489 (N.C. Ct. App. 1999). Therefore, North Carolina insurance law and contract interpretation principles will be applied to the present matter.

A court must grant a motion for summary judgment if the

pleadings, depositions, and affidavits submitted show that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Under this standard, a genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. As a result, the court will only enter summary judgment in favor of the moving party when the record "shows a right to judgment with such clarity as to leave no room for controversy" and clearly demonstrates that the non-moving party "cannot prevail under any circumstances." Campbell v. Hewitt, Coleman & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994) (internal quotation marks omitted). While the movant bears the initial burden of demonstrating that there are no genuine disputes of material fact, once that burden has been met, the non-moving party must demonstrate that a genuine dispute of material fact actually exists. Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 521 (4th Cir. 2003); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). A mere scintilla of evidence is insufficient to circumvent summary judgment. Anderson, 477 U.S. at 252. Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a

rational trier of fact could find for the nonmoving party. Id. at 248–49. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315–16 (4th Cir. 1993).

In this case, the parties have filed cross-motions for summary judgment. Therefore, the court must review each motion separately to determine whether either party deserves judgment as a matter of law. Fed. R. Civ. P. 56(c); Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris, Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). When considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing the motion. Rossignol, 316 F.3d at 523 (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)).

As a federal court sitting in diversity and applying North Carolina law, this court is obliged to apply the jurisprudence of North Carolina's highest court, the Supreme Court of North Carolina. See Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc., 296 F.3d 308, 312 (4th Cir. 2002). When that court has not spoken directly on an issue, this court must "predict how that court would rule if presented with the issue." Id. The decisions of the North Carolina Court of Appeals are the "next

best indicia" of what North Carolina's law is, though its decisions "may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." Id. (quoting Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992)). In predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted).

**B. Duty to Defend**

Plaintiffs contend that Defendants had a duty to defend Rigsbee in the underlying lawsuit, Defendants unjustifiably refused to do so, and as a result, Defendants should be held liable for the judgment against Rigsbee up to their policy limits. As such, the threshold issue is whether Defendants had a duty to defend Rigsbee.

Under North Carolina law, interpretation of an insurance policy, including the extent of the insurer's duty to defend, is a question of law. See Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 340 S.E.2d 374, 377 (N.C. 1986) ("[The duty to defend] is an appropriate subject for summary judgment."). "The duty to defend is generally determined by analyzing the pleadings in the underlying lawsuit." Westfield Ins. Co. v. Nautilus Ins. Co., 154

F. Supp. 3d 259, 264 (M.D.N.C. 2016) (citing Waste Mgmt. of Carolinas, 340 S.E.2d at 377). As such, the courts employ the comparison test, where "the pleadings are read side-by-side with the policy to determine whether the events as alleged are covered or excluded." Waste Mgmt. of Carolinas, 340 S.E.2d at 378. "[T]he facts alleged [in the pleadings] are to be taken as true and compared to the language of the insurance policy." Kubit v. MAG Mut. Ins. Co., 708 S.E.2d 138, 144 (N.C. Ct. App. 2011) (quoting Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C., 692 S.E.2d 605, 610 (N.C. 2010)). "When the pleadings state facts demonstrating that the alleged injury is covered by the policy, then the insurer has a duty to defend, whether or not the insured is ultimately liable." Waste Mgmt. of Carolinas, 340 S.E.2d at 377.

The duty to defend is broad. Where the allegations of a complaint bring a claim within the coverage of the policy, an insurer's duty to defend is absolute. Indiana Lumbermen's Mut. Ins. Co. v. Champion, 343 S.E.2d 15 (N.C. Ct. App. 1986) (citing Insurance Co. v. Insurance Co., 152 S.E.2d 513 (N.C. 1967)). An insurer has a duty to defend against even groundless, false, or fraudulent accusations. Waste Mgmt. of Carolinas, 340 S.E.2d at 378. Only "if the facts are not even arguably covered by the policy" can an insurer be excused from its duty to defend. Kubit, 708 S.E.2d at 144 (citing Waste Mgmt. of Carolinas, 340 S.E.2d at

378). Even where the complaint fails to assert claims falling within the coverage provided, an insurer's duty to defend may still be found where the insurer "knows or could reasonably ascertain facts, that if proven, would be covered by [the] policy." Waste Mgmt. of Carolinas, 340 S.E.2d at 377. However, "the inverse of this inquiry has not been recognized by North Carolina courts and has been explicitly rejected by the Middle District of North Carolina in a decision affirmed by the Fourth Circuit Court of Appeals." New NGC, Inc. v. Ace Am. Ins. Co., 105 F. Supp. 3d 552, 568 (W.D.N.C. 2015) (citing St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co., 724 F. Supp. 1173, 1179 (M.D.N.C. 1989), aff'd, 919 F.2d 235 (4th Cir. 1990)). "Once a complaint implicates the possibility of coverage, an insurer may not exonerate itself by preliminarily determining that no coverage actually exists despite the allegations of the complaint." St. Paul Fire, 724 F. Supp. at 1179; see also Peace Coll. of Raleigh, Inc. v. Am. Int'l Specialty Lines Ins. Co., 5:09-CV-479-FL, 2010 WL 3743539 (E.D.N.C. Sept. 16, 2010). "Permitting evidence outside the pleadings to negate allegations in the complaint is akin to a perfunctory review of the merits of the underlying claims against the insured . . . [and] is not consistent with the duty to defend as explained by North Carolina law." New NGC, 105 F. Supp. 3d at 568. Any doubt as to coverage must be resolved in favor of the insured. Waste Mgmt. of Carolinas, 340 S.E.2d at 378.

Here, the essential facts surrounding the collision are not in dispute. As the Superior Court concluded in the underlying lawsuit, Rigsbee was responsible for Plaintiffs' injuries arising from the collision as a result of his negligence. The issue remains whether Defendants had a duty to defend Rigsbee in that action. The determinative question is whether there existed the "mere possibility," either based in the underlying complaint or in facts discoverable by Defendants, to indicate that Rigsbee may have been covered under the named insureds' policies. See Naddeo v. Allstate Ins. Co., 533 S.E.2d 501, 506 (N.C. Ct. App. 2000), overruled in part on other grounds as stated in Kubit, 708 S.E.2d at 145.

When construing an insurance contract, "the intention of the parties controls any interpretation or construction of the [insurance] contract, and intention must be derived from the language employed." Fidelity Bankers Life Ins. Co. v. Dortch, 348 S.E.2d 794, 796 (N.C. 1986). North Carolina courts have "long recognized [a] duty to construe and enforce insurance policies as written, without rewriting the contract or disregarding the express language used." Id. However, "any ambiguity in the words of an insurance policy [is resolved] against the insurance company." Harleysville Mut., 692 S.E.2d at 612. "To be ambiguous, the language of the insurance policy must, in the opinion of the court, be fairly and reasonably susceptible to either of the

constructions for which the parties contend." Id. (internal quotation marks omitted).

The GEICO policy provides the following pertinent provisions:

> [GEICO] will pay damages for bodily injury or property damage for which any insured becomes legally responsible because of an auto accident. . . . We will settle or defend, as we consider appropriate, any claim or suit asking for these damages . . .
>
> "Insured" as used in this Part means:
>
> > 1. You or any family member for the . . . use of any auto . . .
>
> "Family member" means a person related to you by blood, marriage, or adoption who is resident of your household.

(Doc. 37-11 at 3-4.) The Nationwide policy provides the same pertinent provisions in identical language:

> [Nationwide] will pay damages for bodily injury or property damage for which any insured becomes legally responsible because of an auto accident. . . . We will settle or defend, as we consider appropriate, any claim or suit asking for these damages . . .
>
> "Insured" as used in this Part means:
>
> > 1. You or any family member for the . . . use of any auto . . .
>
> "Family member" means a person related to you by blood, marriage, or adoption who is a resident of your household.

(Doc. 38-3 at 12, 19.) While the parties agree that Rigsbee is related by blood to the named insureds, they disagree as to whether Rigsbee was a "resident" of the named insureds' household at the

time of the accident.[2]

As the words "resident," "residence," and "residing" have "no precise, technical and fixed meaning applicable to all cases," see Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co., 146 S.E.2d 410, 414 (N.C. 1966), North Carolina courts have held that the terms "resident of your household" or "resident of the same household" can be subject to multiple different meanings. Great Am. Ins. Co. v. Allstate Ins. Co., 338 S.E.2d 145, 147 (N.C. Ct. App. 1986); Jamestown Mut., 146 S.E.2d at 416 ("It is . . . difficult to give an exact, or even satisfactory, definition, for the term ['resident'] is flexible, elastic, slippery, and somewhat ambiguous."). Applicable definitions range from "a place of abode for more than a temporary period of time" to "a permanent and established home." Great. Am. Ins. Co., 338 S.E.2d at 147 (citing Jamestown Mut., 146 S.E.2d 410). As such, where the term "resident" is used in an insurance policy and is not defined by that policy, although it does not automatically result in coverage, courts should interpret the term in line with its "most inclusive definition." N.C. Farm Bureau Mut. Ins. Co., Inc. v. Martin by & through Martin, 833 S.E.2d 183, 187 (N.C. Ct. App. 2019) (quoting Monin v. Peerless Ins. Co., 583 S.E.2d 393, 398 (N.C. Ct. App.

[2] Neither Defendant contends that their policy did not provide coverage because Rigsbee was driving a company vehicle in the course of his employment at the time of the accident.

2003)); see also Great Am Ins. Co., 338 S.E.2d at 147 ("[O]ur courts have held that such terms should be given the broadest construction and that all who may be included, by any reasonable construction of such terms, within the coverage of an insurance policy using such terms, should be given its protection."). North Carolina courts have recognized that a person may be a resident of more than one household for insurance purposes. Davis by Davis v. Md. Cas. Co., 331 S.E.2d 744, 746 (N.C. Ct. App. 1985). Ultimately "'[d]eterminations of whether a particular person is a resident of the household of a named insured are individualized and fact-specific.'" Martin by & through Martin, 833 S.E.2d at 187 (quoting N.C. Farm Bureau Mut. Ins. Co. v. Paschal, 752 S.E.2d 775, 780 (N.C. Ct. App. 2019)).

Here, the plain language of the relevant policies restricts and limits coverage to the named insureds and their "family member[s]," which are unambiguously defined by the policy as someone who is "related to [the named insureds] by blood, marriage, or adoption who is a resident of [the named insureds'] household." Comparing this language to the facts alleged in the underlying complaint and facts reasonably discoverable outside the complaint, Defendants were put on notice of the possibility that Rigsbee was a resident of the named insureds' household, and therefore a "family member" for insurance purposes. Although Defendants are correct that Plaintiffs' complaint did not specifically allege

that Rigsbee resided at the Edgewood address, attached to the complaint and incorporated therein were documents which indicated that Rigsbee and Plaintiffs may have considered the Edgewood address to be his residence. (See Doc. 32-5 at 13 (traffic citation for expired registration, listing the Edgewood address and given to Rigsbee on the date of the accident), 1 (civil summons filed against Rigsbee listing the Edgewood address).) Further, by March 2015, Plaintiffs provided Defendants with additional documents from the same period indicating the possibility that Rigsbee was a resident of the Edgewood address in the time around the accident. (See Doc. 32-3 at 13 (affidavit of indigency filed by Rigsbee on October 29, 2013, listing 108 Edgewood as his address), 3 (showing Rigsbee received a North Carolina state identification card on November 22, 2013, listing 108 Edgewood as his address).) Defendants were demonstrably aware of the possibility of Rigsbee's resident status as early as 2015, as evidenced by their decisions to independently investigate that possibility. (See Docs. 37-2, 38-7.) See also Lozada v. Phoenix Ins. Co., 237 F. Supp. 2d 664, 671 (M.D.N.C. 2003) ("It is also important to note that Defendant responded to this information by undertaking its own investigation . . . . Certainly, Defendant's undertaking such an investigation was generated by a concern of the possibility of coverage under [named insured's] policy because of the information provided by Plaintiff that [the potential

insured] was a resident of the insured's household.”). Defendants were provided additional notice of this possibility on March 31, 2017 – almost 15 months before the underlying trial – when Plaintiffs sent them a copy of the underlying complaint, indicating that they believed Rigsbee to be covered under Defendants’ respective policies. (Doc. 32-10.)

Defendants have replied with multiple affidavits indicating that Rigsbee was not a resident of the Edgewood address at the time of the accident. Defendants initially reached this determination in their preliminary 2015 investigations, which ultimately led them to deny coverage and refuse to provide a defense to Rigsbee in the underlying suit. However, as clearly established by St. Paul Fire, “[o]nce a complaint implicates the possibility of coverage, an insurer may not exonerate itself by preliminarily determining that no coverage actually exists despite the allegations of the complaint.” 724 F. Supp. at 1179. Although Defendants have failed to address St. Paul Fire and its related caselaw, the court finds no reason to deviate from this precedent and, as such, Defendants’ evidence of non-coverage is of no consequence. The facts here created the possibility of coverage, Defendants were aware that Rigsbee was potentially an “insured” under the relevant policies, and even though Defendants may have been convinced that their evidence was far more persuasive,

Defendants retained a duty to defend Rigsbee in the underlying suit.

### C. Excess insurers

Defendants argue that their duty to defend Rigsbee did not activate because under the terms of their policies, they were acting as excess insurers. Defendants maintain that as excess insurers, their duty to defend would only have come into existence if the damages exceeded the limits of the primary carrier, Peak. See W & J Rives, Inc. v. Kemper Ins. Grp., 374 S.E.2d 430, 434 (N.C. Ct. App. 1988).

The relevant portion of GEICO's policy states under "Other Insurance":

> If there is other applicable liability insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance.

(Doc. 37-11 at 6.) The relevant portion of Nationwide's policy provides identical language under "Limit of Liability" in a subsection entitled "Other Insurance":

> If there is other applicable liability insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance.

(Doc. 38-3 at 21.) Under North Carolina law, exclusionary clauses in insurance contacts "are not favored by the courts and will be

construed against the insurance carrier and in favor of coverage for the insured." WJ Rives, 374 S.E.2d at 435. Further, even where an excess insurance policy is in effect, "[t]wo insurers can possess concurrent defense duties to a common insured." See Abt Bldg. Prods. v. Nat'l Union Fire, 472 F.3d 99, 117 n.27 (4th Cir. 2006).

Here, a fair reading of the relevant exclusionary clauses indicates that Defendants' duties as excess insurers influence only their duty to indemnify. Each clause states that Defendants "will pay only" their share of the loss should there be other applicable liability insurance and such insurance is only "collectible" in excess of other applicable liability insurance. Neither contract indicates that Defendants' respective duties to defend are modified by this exclusion. As the court must construe the contract as written and any ambiguity must be resolved in favor of the insured, the court does not find this exclusionary provision to modify Defendants' duty to defend.

Further, despite the exclusionary provision, Defendants do not appear to be excess insurers to whom a lesser duty to defend would attach as a matter of course. "[E]xcess insurance has a very particular function, which is to provide coverage for extremely rare events at an affordable premium." ABT Bldg. Prods., 472 F.3d at 143-44 (Niemeyer, J. dissenting). In exchange for lower premiums, excess insurers have a more limited role than

primary insurers. Id. Excess insurers "ha[ve] not signed up to be in the trenches with the insured, litigating claims . . . . Because excess insurance is so inexpensive, insureds should not expect the kind of comprehensive defense" they receive from a primary policy. Id. In this case, Defendants provided and charged their named insureds for primary policies that included duties to defend and indemnify. The fact that other primary insurance was available through Peak does not serve to transform Defendants' policies into excess insurance with a lesser duty to defend. As such, and without specific contractual language indicating otherwise, the court finds no basis upon which to limit Defendants' respective duties to defend based on these exclusionary provisions.

**D. Timely notice**

Finally, Defendants suggest that their duties to defend did not attach because they were not given timely notice that Peak was no longer defending Rigsbee. (See Doc. 37 at 20; Doc. 38 at 12.) This argument encounters two hurdles. First, as primary liability insurers, Defendants' duties to defend attached when they received actual notice of the underlying action. New NGC, 105 F. Supp. 3d at 569 (citing Kubit, 708 S.E.2d at 154). Therefore, Defendants' duty to defend attached, at the latest, by March 31, 2017, irrespective of Peak's defense of Rigsbee. Although this represents a delay of over nine months between the filing of the

underlying lawsuit and the provision of notice to Defendants, "an unexcused delay . . . in giving notice to the insurer . . . does not relieve the insurer of its obligation to defend . . . unless the delay operates materially to prejudice the insurer's ability to investigate and defend." Great Am. Ins. Co. v. C.G. Tate Const. Co., 279 S.E.2d 769, 771 (N.C. 1981); see also St. Paul Fire & Marine Ins. Co. v. Hanover Ins. Co., No. 5:99CV164BR-3, 2000 WL 34594777, at *8 (E.D.N.C. Sept. 19, 2000). Here, Defendants have not argued, nor have they provided any evidence, that this late notice — which was given almost fifteen months before trial — materially prejudiced their ability to investigate and defend the action such that their duties to defend should be excused.

Second, even if Plaintiffs' late notice may have otherwise excused the duty to defend, "[t]he rule in North Carolina is that the denial of liability on another ground operates as a waiver of the notice requirements, being regarded as a statement that payment would not be made even though policy provisions had been complied with." Taylor v. Royal Globe Ins. Co., 240 S.E.2d 497, 499 (N.C. Ct. App.), disc. rev. denied, 244 S.E.2d 146 (N.C. 1978) (citing Davenport v. Travelers Indem. Co., 195 S.E.2d 529 (N.C. 1973)). "Consistent with this rule is the rule . . . that the unjustified refusal of the insurer to defend an action against the insured on the ground that the claim on which the action is based is outside the policy coverage deprives the insurer of its right to insist

upon compliance with a policy provision." Davenport, 195 S.E.2d at 532–33. Here, Defendants do not allege that they would have defended Rigsbee had notice been given, either upon the filing of the underlying lawsuit or upon Peak's payment of its limits and withdrawal. Rather, as shown by their respective denials of coverage as early as 2015, Defendants have indicated all along they had no duty to defend whatsoever based on their determination that Rigsbee was not covered under their respective policies. (See Doc. 37 at 7; Doc. 38 at 4-5 (denying claim for excess liability coverage based on non-coverage).) As such, any claim that Defendants' respective duties to defend were excused due to lack of timely notice are considered waived.

**E. Unjustified breach of the duty to defend**

As the evidence was sufficient to put Defendants on notice that there was a possibility of coverage for Rigsbee's accident under their respective policies, Defendants breached their duty to defend and their refusal to defend was unjustified. Lozada, 237 F. Supp. 2d at 672.[3] Because Defendants' refusal to defend was

[3] This interpretation derives from a long line of decisions by the North Carolina Court of Appeals. See, e.g., Ames v. Cont'l Cas. Co., 340 S.E.2d 479 (N.C. Ct. App.), disc. rev. denied, 345. S.E.2d 385 (N.C. 1986); Duke Univ. v. St. Paul Fire & Marine Ins. Co., 386 S.E.2d 762 (N.C. Ct. App.), disc. rev. denied, 393 S.E.2d 876 (N.C. 1990); Naddeo v. Allstate Ins. Co., 533 S.E.2d 501 (N.C. Ct. App. 2000), overruled in part on other grounds as stated in Kubit, 708 S.E.2d at 145; Pulte Home Corp. v. Am. S. Ins. Co., 647 S.E.2d 614 (N.C. Ct. App. 2007), disc. rev. denied, 666 S.E.2d 485 (N.C. 2008); Erie Ins. Exch. v. Builders Mut. Ins. Co., 742 S.E.2d 803 (N.C. Ct. App.), disc. rev. denied in part, 747 S.E.2d 545 (N.C. 2013). This court and the Fourth Circuit have also

unjustified as a matter of law, the court need not reach the issue of whether Rigsbee would have qualified as an insured under Defendants' respective policies had they elected to defend him in the underlying suit.[4] As this court explained in St. Paul Fire, an insurer has three options under North Carolina law when faced

---

relied on this case law. See St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co., 724 F. Supp. 1173, 1179 (M.D.N.C. 1989), aff'd, 919 F.2d 235 (4th Cir. 1990). North Carolina's view reflects a minority position among states. See Stanley C. Mardoni, Estoppel for Insurers Who Breach Their Duty to Defend, 50 J. Marshall L. Rev. 53 (2016). The North Carolina Court of Appeals' interpretation appears to be in tension with certain earlier decisions of the North Carolina Supreme Court regarding this issue. See, e.g., Squires v. Textile Ins. Co., 108 S.E.2d 908, 912 (N.C. 1959) ("The judgment is, therefore, conclusive as to the insurer on the question of agency and damage. The only defense available to the defendant is that its policy does not cover the insured's liability."); Nixon v. Liberty Mut. Ins. Co., 120 S.E.2d 430, 435 (N.C. 1961) ("If the policy here was in force at the time plaintiff was injured, . . . then defendant's refusal to defend the action . . . was a breach of its contract with its insured, and was an unjustified refusal." (emphasis added)). However, in light of the significant number of decisions from the North Carolina Court of Appeals on this matter, coupled with the North Carolina Supreme Court's consistent denial of discretionary review of those cases, the court declines to second guess this line of authority. See Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) ("[T]he district court[] must follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." (internal quotation marks omitted)). Moreover, Defendants' contention that Lozada is distinguishable because that case involved a default judgment against the insured, rather than a jury verdict, is unpersuasive to alter the state's general rule that an unjustified failure to defend renders the insurer responsible whether the determination was by default, verdict, or settlement. See Duke Univ., 386 S.E.2d at 763 ("By refusing to defend[,] . . . defendant obligated itself to pay the amount and costs of a reasonable settlement if its refusal was unjustified.").

[4] It is not lost on the court that had Defendants provided a defense, they likely would not have been required to indemnify Rigsbee. Defendants' evidence indicates that at the time of the accident, Rigsbee was a 45-year-old drug addict without a stable residence. He had not been welcome at the household of the named insureds, his parents and brother, since 2009 and appears to have used the named insureds' residence solely as an occasional mailing address.

with a request to defend an insured against claims which the insurer believes exceed the policy coverage. An insurer may: "(1) seek a declaratory judgment regarding its obligations before or pending trial of the underlying action, (2) defend the insured under a reservation of rights, or (3) refuse either to defend or to seek a declaratory judgment at the insurer's peril that it might later be found to have breached its duty to defend." St. Paul Fire, 724 F. Supp. at 1180 (quoting Maneikis v. St. Paul Ins. Co. of Illinois, 655 F.2d 818, 821 (7th Cir. 1981)). Here, Defendants chose the third option, and that decision was certainly at their peril, as the court has found that Defendants unjustifiably breached their duty to defend Rigsbee.

The court must now consider what obligation Defendants have with regard to the judgment entered against Rigsbee. As established by Lozada, "where Defendant had a duty to defend which arose from the possibility that a claim was covered and, when Defendant declined its opportunity to defend, the judgment rendered in favor of Plaintiff became binding on Defendant . . . to the extent of its policy limits." 237 F. Supp. 2d at 674 (citing Wilson v. State Farm Mut. Auto. Ins. Co., 394 S.E.2d 807 (N.C. 1990)). Here, Defendants GEICO and Nationwide's policy limits are $60,000 and $100,000, respectively. Plaintiffs seek no more, and Defendants do not contend they would not be liable for

those amounts should the court find a breach of the duty to defend. Defendants are therefore liable to Plaintiffs up to those limits.[5]

## III. CONCLUSION

For the reasons stated, Defendant GEICO's motion for summary judgment (Doc. 42) is DENIED; Defendant Nationwide's motion for summary judgment (Doc. 44) is DENIED; Plaintiffs' motion for summary judgment (Doc. 31) is GRANTED; and Plaintiffs' motion to stay discovery pending ruling on Plaintiffs' motion for summary judgment (Doc. 33) is DENIED AS MOOT.

IT IS THEREFORE ORDERED that Plaintiffs shall have and recover of Defendants GEICO and Nationwide $60,000 and $100,000, respectively, with respect to payment of the judgment Plaintiffs recovered in the underlying lawsuit against James Rigsbee.

/s/ Thomas D. Schroeder
United States District Judge

November 25, 2020

[5] Defendants do not address whether their respective liabilities should be shared pro-rata. As the judgment against Rigsbee exceeds Defendants' combined policy limits, this is of no consequence.